We're ready for you, Counsel. Thank you, Your Honor. May it please the Court. My name is LeVon Houghton Tannion, and I represent the Albertone appellants in this case. I've been authorized by Mr. Chris Steed, who's in the courtroom today, to advise the panel that I also, for purposes of this argument, the Bailey appellants, the other group of appellants in this case, agree with and adopt my arguments. I've also been advised by your clerk to say, if I want a particular split of time, it's a good time to tell you now. And I'd like six minutes, please, for my argument in chief and four for rebuttal, with the panel's permission. We're here under Rule 60b-4 and Rule 60b-6, arguing two reasons that Judge Rothstein erred in denying the relief requested in this case. Rule 60b-4... You're up against it right to start with, because it's not doing anything within one year. You are correct, Your Honor. I didn't understand what the good excuse was. Well, Your Honor, that comes under excusable neglect, and that's 60b-1. 60b-1, of course, has the one-year time limit that 60b-4 and 60b-6 do not. B-4 and B-6 use the within a reasonable time frame that's within the rule and are not bound by the one-year time limit. It's often shorter than the one year. It may be, Your Honor. There are cases in which it is. That's correct. In this case, we will and we have argued that it's actually much more time than one year for various facts. But let me address the first part of your question. The concept of excusable neglect, while it might be phrased differently for B-4 and for B-6 cases, comes into play as to the reasons that we needed 60b relief and to explain the delay. Let me ask the question a different way. I have the same concern Judge Kleinfeld has. Judge Rothstein found, as a matter of fact, that there was not good cause here because it amounted simply to inattention of counsel. Correct. Now, how is that excusable neglect under the case law? Well, Your Honor, I don't think just that alone equates to excusable neglect. What is your cause? Because inattention of counsel seemed to have been offered as the justification that there was this turnover and so on. It was, Your Honor. My mother was getting the mail and nobody apparently was paying any attention to the mail at the prior counsel's office. Well, the excusable neglect goes to 60b-1 without question. But forget about that. I just want to know what is your best case for explaining why prior counsel did not get a response to the court's case management orders, which are very important in a district litigation case. Absolutely. And the best reason is he didn't get them. The district court had the wrong lawyer listed as lead counsel. They had the wrong address, the infamous grandmother's address, for the wrong lawyer. Why wouldn't you catch that before two years? I mean, representing a client and not getting the mail, you'd think the lawyer would catch that. Well, Your Honor, you – well – But the reason they had the grandmother's address was because the lawyer gave it to them, right? Well, not necessarily, Your Honor, and that's – That was on his – right? That was – who else gave it to the court besides the lawyer? Well, the evidence shows that he – and we're talking about Mr. Boddy. He gave his grandmother's address to the Northern District of Mississippi way back when, when that really was his address. I know, and he never changed it. There's nothing in the record that shows he said, well, I've changed my address to so-and-so. That's correct. So he gave it to them. Well, Your Honor – That's the lawyer's responsibility. Well, he didn't give that address to the Western District of Washington, though. It looks like the clerk gave him notice reasonably calculated actually to apprise him of what the contents of the order was. She sent the notice to the only address he'd ever given to the court. Well, Your Honor, see, the problem is there's no evidence in the record that he gave that address to the Western District of Washington. He never gave any address to the Western District of Washington. His grandmother's address that he'd given to the court that was previously handling it, he knew that file would be transferred over. If he wants the new court, Western District of Washington, to use some other address for him, you'd think he'd tell them. I mean, the clerk has to know where to mail these things, so she mails it to the only address she's got. Well, Your Honor, of course, and the problem that even exists before that problem is we're not even talking about the right lawyer. We're talking about Mr. Abadie. You're not suggesting that prior counsel didn't know that the case had been transferred from Mississippi to Seattle? I'm sorry, Your Honor, by prior counsel, you mean Mr. Funches? Yeah. I'm trying not to lay all this off on you because I understand that this all happened before your watch. So when I say prior counsel, that's who I'm talking about. Understood. And there's no suggestion in the record that neither Mr. Funches nor I can't even pronounce his name. Mr. Abadie. Mr. Abadie. Correct. That they didn't know that the case had been transferred. No. Well, there's no evidence in the record that they did not know that the case was transferred to the Western District of Washington. That's correct. The problem occurred. So why isn't it, to get back to Judge Tashima's question, why isn't it the obligation of counsel to make sure when his case gets transferred to a new court that they've got the correct contact information for counsel? Well, Your Honor, there is some responsibility there. To be sure, there is some responsibility on the part of Mr. Abadie, Mr. Funches, actually, since he was the lead counsel back then. I don't disagree. And we're not here to tell the Court that there weren't things that Mr. Funches and Mr. Abadie could not have done. So you're not questioning under a clearly erroneous standard the district court's factual finding that there was, in fact, inattention by counsel? No, we do question that, Your Honor. We do question that. What we're saying is that this is – What evidence do you have to convince us that we should reverse her under an abuse of discretion because she made a clearly erroneous factual determination that there was inattention of counsel? Simply because the facts that we've been discussing under the context of 60B relief, 60B-4 and 60B-6 relief, do not equate to the kind of inattentiveness or inattention of counsel that should lead a district court to say, I'm denying the relief for that purpose. Let me ask the question a different way. What evidence can you cite to me from the record that counsel was paying any attention to what was going on in this litigation? Your Honor, there's a lot of it. There's a lot of evidence. For instance, the adherence to CMO-6, the adherence to CMO-13, correspondence back and forth between the two sides in this case. Well, what it looks like is it has the look, partly because of the length of delay and partly because of the amounts at stake, that once it turned into a nickel-and-dime case, counsel kind of ignored it. Your Honor – Pioneer versus Heritage. I agree with you that that requires a court to cut a lot more slack than it had to before for excusable neglect. Professional error by the attorney can be excusable neglect, even though it's neglect and negligent. But here, that's what the record looks like to me, and we review for abuse of discretion, and I don't quite understand why the district judge couldn't say, well, geez, after two years, and the clerk sent it to the only address he ever gave, goodbye. Well, Your Honor, and I think I can answer those questions. First of all, respectfully, we don't think there's any evidence in the record that shows when it started looking like a lower-dollar case that that's when Mr. Funchess or Mr. Boddy tuned out. We think the problem was the failure to receive, and again, we're not saying that there weren't things that they could not have done, but the failure to receive, for instance, the two CMOs that we're here to talk about, 13 and 15A, and the motions to dismiss. And then, and this is getting more directly to the answer to your question, the dismissal order itself. The delay between, well, there was a delay between the dismissal order and the 60B-4 and 6 and back then 1 motion. Part of that delay, the most significant part of that delay, is explained by the fact that when it became apparent to Mr. Funchess and Mr. Boddy that the case had been dismissed, they got in touch with the O'Quinn Law Firm. And the O'Quinn Law Firm, as you would expect, launched an investigation that took them to Mississippi, that led them to interview witnesses, starting with Mr. Funchess and Mr. Boddy, that led them to start researching the law and determining whether the fact pattern that they had uncovered actually supported 60B relief. During that time, approximately two months or so went by. Now, the appellees say, well, there's your unreasonable delay. What we say is, no, there's your due diligence, because unreasonableness would have been ---- The two months doesn't really concern me. It's the two years that concerns me. Your Honor, the two years between the dismissal and the discovery of the dismissal. Well, see, but it's not two years in a vacuum. There were things going on in those two years. For instance, the parties don't ---- That cuts the other way. What was going on during the two years is it turned from potentially a really big case into something that wasn't. Well, Your Honor, respectfully, I don't think the record shows that. I think what the record shows is that there was still a belief on the part of Mr. Funchess and Mr. Boddy that this was a case that did have some high damage value. And I think the activity between the two sides and the adherence to CMO 6 and CMO 13 supports that rather than refutes that. And I'll give you an example. The two parties in this case, or the two sides, don't dispute that there were letters back and forth between the two sides. There were several letters sent, for instance, by the appellees' paralegals to counsel for the appellants. And these letters would give a reasonable person the idea that, well, look, this case is still going on. But what I find odd, and what the district court found odd, was that it's only the letters that included things that required Funchess and Boddy to do something that they claim they never received. Otherwise, they received it all. Well, Your Honor, but, well, respectfully, that's not ---- That's how I read the record. That's how the district court read the record. What's clearly erroneous about that factual finding? Well, two things. Number one, they adhered to CMO 6. Number two, they adhered to CMO 13. Both of those required them to do things, which they did. And they concede that they got those CMOs. They adhered to them. There was no question about that. They're not saying, Mr. Funchess and Mr. Boddy do not say in their affidavits that they never received anything in this case. They frankly and candidly concede that they did. What they're saying is they didn't get the things that they needed the most, CMO 15 and 15A, the motion to dismiss, and then, most tragically, the dismissal order itself. Were they counsel in any other claims besides the ones that are before us today? Well, Mr. Boddy shouldn't have even been in this case. He was never even lead counsel in this case. Well, you used the word lead counsel. As I recall from the record, he signed the complaints, did he? No, Your Honor. Mr. Funchess did. Funchess did. Correct. Mr. Funchess and he was the only ‑‑ his firm was the only lawyers on the original complaint. But Boddy's name was on the original docket sheet of Mississippi's. That's right. He must have supplied it to the district court while he was an associate of Mr. Funchess, didn't he? Well, Your Honor, there's no ‑‑ actually, the record doesn't speak to that one way or the other. Do you think the grandmother supplied it? I beg your pardon, Your Honor. Do you think the grandmother supplied it? I don't think so. The district court didn't think so. No, the district court did not. But the record doesn't show. What the record shows is that he gave it to the northern district of Mississippi back when he got admitted to the bar. And at that point, he did receive mail at his grandmother's address. The record is silent beyond that. That's why earlier my answer has to be I don't know how the western district of Washington got this address. There's nothing in the record that ‑‑ Well, the way to get it is very simple, you know. I mean, I've been an MDL transferee judge. The only thing you know about the case from Mississippi is what the clerk in Mississippi sent you. So they got it from Mississippi, the clerk in Mississippi. And that's the only record, the address, the Mississippi court had for that lawyer. Well, Your Honor, the ‑‑ And it's his responsibility. If he moves to change his address, and he didn't do that apparently, that's a fair inference. I think ‑‑ but the problem is, of course, we're between the northern and the southern district of Mississippi. This case came from the southern district of Mississippi, and there's just nothing in the record to indicate how they got that address. We concede it's absolutely true. He provided it to the northern district. We don't know how the southern district got it. We do know that that's the wrong attorney, that it should have been Mr. Funches and not Mr. Boddy, and hence not Mr. Boddy's grandmother. But Boddy was working for Funches. I mean, there's a certain amount of, you know, where's the pea in the pod here, and Mr. Funches is claiming lack of responsibility for the work of an associate that he employed, an associate who left his employee, and apparently Funches and his staff did nothing to do what competent lawyers do when we have an associate leave our firm to make sure that we've got coverage on all the cases that they were handling. Your Honor, I understand your concern. He left on June 6, 2003. And, of course, the great majority of what we're talking about, if not all of it, was post-June 6, 2003. And that's, I think, what went into Judge Rothstein's factual determination, that there was complete inattention to this matter by Mr. Funches and his firm. Well, and again, we have to be candid with the Court. We're officers of the Court. We're not here saying there's nothing they could have done differently. There are things they could have done differently. Only a – I think we understand your argument. Sure. Thank you, Counsel. Thank you, Your Honor. Counsel. May it please the Court, my name is Jim Lehman. I'm here on behalf of my client, Wyatt Pharmaceuticals, but also representing the other defendants' respondents with respect to this oral argument. I'd like to address a question by Judge Tallman, and then I'll proceed with my argument or follow the course of questions. If you look at the record at Excerpt to Record 53, page 37, I think that Mr. Katouche, Mr. Bode, did sign the complaint, or that was my understanding. That's how I read the record, too. And if you review his deposition, which is in the record at Excerpts of Record tab 14, S.E.R. beginning of 188, you'll see a discussion of the card that he filled out in his own handwriting and submitted when he was admitted to the bar to the Court back in 1999. If we had more time, we could talk about all the ingredients of a great John Grisham novel here. We have a very prominent Texas, nationally prominent Texas plaintiff's law firm who rounds up 80 plaintiffs, finds a charismatic Mississippi lawyer named Delano Funchess and his associate named Katouche Bode, and they file a mass action of 91 plaintiffs in Mississippi. The problem is the story really dies at that point because while, in fact, the attorneys do participate in some of the proceedings, which I believe is the Achilles heel to the 6dv6 argument, the fact that they participate in the CMO 6 and the CMO 13 affirmations shows that this is inexcusable neglect. It's not gross or egregious conduct like this Court has recognized that is required for 6dv6 exceptions. As this Court has recognized, Rule 6dv6 is an extraordinary remedy. It requires the most egregious of attorney conduct. In general, it requires misrepresentations to the client where the attorney is suggesting that everything is okay with the case. Well, wait a minute. I don't think that's true. We had an en banc about a jockey. His name slips my mind right now. At the panel level, we said something like what you just said. And then on the en banc, we said, no, no, Pioneer v. Heritage softened it up. Your Honor, I would refer you to a trilogy of three cases. And these are the cases that I think are most of interest. Okay. That was it. Pinquet. So why don't you address Pinquet, P-I-N-C-A-Y. I'll be candid with the Court. I'm not familiar with the Pinquet case. The cases that we've cited in our brief and that the opposing side has cited involved the ---- Mr. En banc and Pinquet on what is excusable neglect? Your Honor, I'm not sure. I thought that Pinquet dealt with 6dv1 as opposed to 6dv6. I may be incorrect about that. And if ---- I could be incorrect, too. I remember it as dealing with just how far Pioneer went to soften up our previously tough standard on excusable neglect. Well, I would certainly defer to your memories, Your Honor, and there may be a case that I'm not sure what the date on Pinquet was, and so if it was a recent case, then I may have missed that case. I would submit that the Court's ruling in ---- that began in the early 90s with Alpine Reservoir and then was analyzed very closely in the Taney case, which Judge Palman is ---- was on the panel and wrote a vigorous dissent regarding. And then most recently in ---- was followed up with the Latshaw case. So you're not relying on my dissent, I take it? No, Your Honor, I'm not. But your dissent ---- Never mind. Go ahead. Your dissent was very informative because it talked about how that case was a new shift where the Court had previously not gone with respect to 6dv6. And the subsequent opinion that followed that case, the Taney case, the Latshaw case, which was a 2006 case by this Court, said we went there in Taney, but we're not extending the 6dv6 decision, which we really think is limited to default judgments and really shouldn't go beyond that. We're not extending that to a Rule 68 type relief. We're not going to allow Rule 68. And so you've got a trilogy of cases, and if I've missed one, then I apologize, Judge Kleinfeld, but you do have one as of 2006 with respect to the Latshaw matter, which looked back at Taney and said we went farther with 6dv6 in Taney than we'd ever gone before. We're not going to expand it any further with regard to Latshaw. But if you look at the jurisprudence with regard to 6dv6, it traditionally relates to default judgments, which is a highly disfavored ---- it's something that the courts have always looked upon very skeptically. It's something that the courts have been very concerned about, where it is just an egregious case of ignoring the record with respect to ignoring any attorney's responsibility. Here you had lawyers who were actively responding to the plaintiff's fact sheets, and it's convenient for the plaintiffs to separate themselves from the two Mississippi lawyers. Delano Funchess and Katush Bode are not here today. But the O'Quinn firm was the firm that supplied the plaintiff's fact sheets, and this is in the summer before the cases were dismissed. Significantly also, the O'Quinn firm, according to Mr. Funchess in his deposition, represented 80 of the 91 plaintiffs. So you've got three law firms, or once Mr. Bode left Mr. Funchess's firm, you've got three different lawyers that have professional obligations. Judge Talman, you asked the question, did they have any other cases in their deal? It turned into a case where you've got maybe three law firms dividing up one-third of a five-figure total? It very well could have been, Your Honor. I don't have a good explanation. I also don't have a good explanation why it took two years in order to complain about the dismissal. The record is much clearer than I think that so far I think plaintiff's counsel has done an admirable job of bringing in aspects of a standard of review with concepts of excusable neglect, with concepts of due process, and intermingling the different standards under Rule 60 that don't overlap. Now, as the Supreme Court said in Pioneer, Rule 60b-1 and Rule 60b-6 are mutually exclusive. You can't have it both ways. If you're arguing excusable neglect on one side, you can't say exceptional circumstances on the other side, or you end up with the problem that you identified in your dissent, Judge Talman, which is you're encouraging people to be grossly negligent as opposed to merely negligent. The situation here from the factual record is that you, as much as plaintiffs would suggest, that you resolve all doubts in favor of the moving party, that's simply not the jurisprudence of this Court. The one case that they rely upon is the Tenth Circuit case, the Cessna case, and that case actually acknowledged the standard of review was in fact abuse of discretion. They affirmed the district court's denial of the Rule 60b relief, and this was simply a dictative statement that you resolve all doubts. In fact, in that court, they evaluated testimony and went with the district court's decision. Here in this case, you've got the mailbox rule, which the U.S. Supreme Court has adopted, and this Court has reaffirmed, where they said if it's put in the mail, you've got to do more than say you didn't get it in order to overcome the presumption that you got it. And there are so many pieces of mail that affidavits have certified before this Court that were sent. The evidence is overwhelming. It's not a matter of resolving all doubts in favor of the moving party. There's simply no credibility there. Number one, you've got Lance Palmer, the plaintiff's liaison counsel, not even on our side of the V, who has submitted an affidavit to this Court that said every one of the CMOs, including CMO 15, and by the way, I don't think you could have gotten CMO 6 and CMO 13 without also getting CMO 15 in part of that package. Excuse me. You've got him further, and by the way, he says he sent that to both Mr. Funchess at the 1617 Robinson address, as well as Mr. Bode at the grandmother's address, as well as the O'Quinn firm, because they were counsel of record as well. Moreover, you've got him affirming that he sent the two warning notices from the judge saying, you better comply or you're going to be dismissed, and I'm telling the defendants to move to dismiss now. But probably some of the most important evidence is the proposed notices of dismissal. Could you back up for a second? Yes, Your Honor. Let's see. There were two letters saying comply with the case management order, or else the case will be dismissed? Your Honor, I think that there are three pieces of evidence that are. . . Maybe you could lay out, just to make it easy for us, the date of the case management order, the date of each of those two letters, and the date when something was, of the dismissal, and the case when something was finally done. I would be happy to. And I'll group those into three different categories, the court orders that Mr. Palmer submitted, the private letters that Chatham's counsel and other counsel submitted, and then the proposed notice of dismissal that specifically went to Mr. Funchess. Just give me a timeline. I didn't have a neat timeline. Your Honor, CMO 15 was entered on May 30, 2003, and then that was followed up with a minute order on 7-31-2003. And that was sent to both Mr. Funchess and Mr. Bode, according to the declaration of Lance Palmer. Then CMO, and that minute order warned them, I need you to, you haven't complied, you've got to start dismissing. CMO 15A clarified CMO 15, that was entered on 8-27-03, and that went to both as well, as well as to the O'Quinn firm. Now, on September 8, 2003, Chatham, the defendant Chatham, sent a letter to Funchess and Bode that there's no fact sheets for the 28 plaintiffs, and then they sent a further letter regarding CMO 15 on 9-16, and that is in excerpts of record tab 53, 99-100. You'll see it with regard to an affidavit of Mr. Rick Burson. Then what you, you have additional letters regarding deficiencies in the plaintiff's fact sheets. There were some 25 that weren't completed, and many of the 65 didn't include the required information. You had a letter regarding CMO 6 in September, but then there's a new order regarding CMO 15 and 15A that was filed by the court in late October, November of 03, which, again, Lance Palmer says went to everyone. And then three days after that order, where the judge says, defendants, you shall move to dismiss, where they have not complied with these CMOs, on 11-7-03, the first proposed order of dismissal under CMO 15 was sent out, and it went to Mr. Bode. And then there was a second proposed order, and I specifically asked the court to look at the supplemental excerpts of record tab 24, because in the second proposed order, not only did it include all the Britain plaintiffs, but it was directly addressed to Mr. Funchess at his 16-17 Robinson address. There were additional information regarding curing some of the deficiencies in the PFSs, and then in May of 2004, the judge dismissed, based on the first and second proposed orders of dismissal, the Britain plaintiffs. Then you had almost two years with respect to before anyone complained. I think my time is up, and I hope I answered your question. Yes. Thank you. Thank you, counsel. Your Honor, I'm sure I went through most of my time. Actually, you went four and a half minutes over it, but take one minute or so to rebut. Thank you, Your Honor. I just have two main points on rebuttal. May it please the Court. First, Mr. Funchess's name is on the complaint. The complaint includes all of the Britain plaintiffs. As a matter of law, then, all of the Britain plaintiffs are represented by Mr. Funchess, every one of them. But Bode signed the complaint. Your Honor, and perhaps I misunderstood your question. Let me be perfectly clear. The actual signature on the complaint is Mr. Bode's. That's what I thought. Then I misunderstood. I wasn't suggesting that Funchess wasn't on the heading. Correct, correct. And I believe, yes, that's correct. His was the law firm. But the actual signature is supplied by Mr. Bode. That is correct. I agree with Mr. Lehman and obviously with the panel on that. The second point is that we heard a lot from Mr. Lehman during his time about what was sent out and about what's in Mr. Palmer's affidavit about what he sent out. But we didn't hear much about what was received. And that is the problem in this case. Mr. Bode's affidavit and Mr. Funchess's affidavit are both unrebutted in the record that they did not receive the two CMOs that are at issue here, the motion to dismiss and the dismissal order. But they – but conspicuous by its absence is any acknowledgment that throughout that time period they were receiving a lot of these other documents that Mr. Lehman just outlined. You're correct. That was the basis for my observation. And I didn't mean to be coy. No, no, not at all, not at all. About the fact that, you know, some things they obviously received, but the things that required them to do what we needed them to do here they claimed they mysteriously didn't receive. True, for the purposes – that's right, for the purposes of the dismissal. But while those things are not reflected in their affidavits, they are reflected in other places in the record. Mr. Palmer's declaration is unrebutted in that respect. Correct. They're not saying they didn't get all these. That's correct. And we have no quarrel with Mr. Palmer's affidavit. We believe him, certainly, and we have no evidence to the contrary that he sent them. What we're saying is those particular items that we needed the most we didn't get. And that's also unrebutted in the record. Thank the Court for letting me go over my time. Thank you, counsel. Thank you very much. And Britain v. Bayer is submitted. And we'll hear Jones v. U.S. National Bank.
judges: Kleinfeld, Tashima, Tallman